Filed 07/13/21

VERMONT SUPERIOR COURT

Washington Unit
65 State Street
Montpelier VT  05602
802-828-2091
www.vermontjudiciary.org



CIVIL DIVISION

Case No. 338-10-20 Wncv

| Vermont Journalism Trust vs. Vermont Agency of Com |
|---|

## ENTRY REGARDING MOTION

Title:              Motion for Summary Judgment; Cross Motion for Summary Judgment
Defendants' Motion for Summary Judgment and Incorporated Memorandum of Law;  (Motion: 3; 4)
Filer:         Lia N. Ernst
Filed Date:     March 16, 2021; April 27, 2021

The motion is GRANTED IN PART and DENIED IN PART.

Cross-Motions for Summary Judgment

This is a public records case in which Plaintiff the Vermont Journalism Trust, which operates the VTDigger.org news website, has sought the production of certain public records from Defendant the Vermont Agency of Commerce and Community Development and its secretary, Lindsay Kurrle, in official capacity only (collectively, ACCD or the State).  The disputed records consist of e-mails to or from ACCD's former secretary Lawrence Miller and several key figures directly involved in or related to the sprawling Jay Peak EB-5 fraud scandal during key years (the Miller e-mails).  The ACCD withheld those records under the "litigation exception" to the Public Records Act, 1 V.S.A. § 317(c)(14).[1]  The parties have filed cross-motions for summary judgment addressing whether the documents have been properly withheld although, as described below, the underlying events have partially overtaken the pace of this case.

The defrauded EB-5 investors currently are suing the State and two State officials based on their alleged roles in the fraud in *Sutton v. Vermont Regl. Ctr.*, No. 100-5-17 Lecv (Vt. Super. Ct.).  Mr. Miller originally was a defendant in that case, though he was later determined to have absolute immunity. *Sutton v. Vermont Regl. Ctr.*, 2019 VT 71A, ¶ 48.  The *Sutton* litigation is ongoing.  The State originally

---

[1] At issue are over 1,000 records the State deems "relevant" to litigation.  The State originally identified approximately 300 other potentially responsive but not-relevant-to-litigation records that it believed were outside the scope of the Trust's interests.  It has since voluntarily produced those records upon clarification that the Trust in fact wanted them.

denied the Trust's request claiming that the documents are "relevant to" the *Sutton* litigation under Exemption 14.

Exemption 14 allows the State, in response to a public records request, to temporarily not produce "[r]ecords which are relevant to litigation to which the public agency is a party of record, provided all such matters shall be available to the public after ruled discoverable by the court before which the litigation is pending, but in any event upon final termination of the litigation." 1 V.S.A. § 317(c)(14). The Trust argues that Exemption 14 does not apply here because it (the Trust) is not a party to the underlying litigation and, otherwise, the court should import a balancing test from the law of other states or otherwise substantially narrow Exemption 14 due to intense public interest in the EB-5 scandal and its private motivations to reveal and report on the State's involvement. The Trust also argues that the State essentially has manipulated the underlying litigation to avoid production, that litigation is taking too long in any event, and the records somehow are not relevant to the underlying litigation even though the Trust believes they will document individual State actors' complicity or negligence regarding the fraud, the very claims the *Sutton* plaintiffs are asserting.

The Trust's arguments are at war with the language of Exemption 14 and binding precedent that this court has no authority to disregard or alter in the manner urged. The Vermont Supreme Court interpreted Exemption 14 in *Wesco, Inc. v. Sorrell*, 2004 VT 102, 177 Vt. 287, and *Shlansky v. City of Burlington*, 2010 VT 90, 188 Vt. 470. In *Wesco*, the Court broadly held that the plain language of Exemption 14 extends to documents "that are relevant—related or pertinent—to, and not merely discoverable in, pending or ongoing litigation" until the litigation ends or the litigation-court orders production in discovery. *Wesco*, 2004 VT 102, ¶ 14. In *Shlansky*, the City had withheld some documents in response to Mr. Shlansky's records request that the City itself had determined were "completely irrelevant" to related traffic-ticket litigation. *Shlansky*, 2010 VT 90, ¶ 4. The Court ultimately remanded for a better "related or pertinent" showing to the trial court. However, it noted that the City's decision was illogical on its face, and it otherwise saw no evident connection between certain records that may reflect on the general functioning of the police department and whatever specific issues there may be in Mr. Shlansky's traffic ticket case.

*Shlansky* does not draw the brightest of lines demarcating relevance for Exemption 14 purposes but its purport is that the proper breadth of relevance is mediated both by *Wesco's* broad "related or pertinent" showing as well as by the actual litigation interests of the public agency in the underlying case. In *Shlansky*, the City essentially claimed that the withheld records were relevant to the underlying litigation *in some fashion* though they had no bearing on the City's actual litigation interests in the underlying litigation. If a public records requestor seeks documents that are "relevant" to issues or facts in the public agency's underlying litigation, but the agency has no underlying litigation interest in not producing those documents, then they should not be withheld under Exemption 14. To do so would be to use relevance as a "magic word" to maximize secrecy, which is not the point of Exemption 14.

*Shlansky*, 2010 VT 90, ¶ 12.  Exemption 14 protects the public agency's legitimate, ongoing litigation interests and nothing more.


The Trust's principal arguments may be dispensed with summarily.  The argument that Exemption 14 does not apply because it (the Trust) is not a party to the underlying litigation makes no sense.  Exemption 14 applies when a records requestor seeks documents relevant to litigation to which a public agency is a party.  It is not based on the private motivations of the requestor (discovery-related or otherwise), and any third party could get access through a public records request and hand the documents over to the litigant.  It plainly applies equally to the State's adversary and any other third party.


The Trust's argument that the court should adopt a balancing test or otherwise narrow Exemption 14 substantially is simply incongruous with *Wesco* and *Shlansky*, which are binding.  If change is to be made, then legislative action is the best probable method for doing so.


The Trust's argument that its private motivations—to uncover the State's alleged misconduct and report on it—are irrelevant.  The private motivations of a public records requestor are irrelevant to the analysis of records exemptions.  Neither the website it operates nor its prior reporting on the EB-5 scandal give the Trust any special status under the Public Records Act.  Public agencies have been pointedly advised that the motivations underlying public records requests are not up for consideration.  That is a two-way street.  See *Finberg v. Murnane*, 159 Vt. 431, 437 (1992) (noting that identify and motive of requestor are irrelevant to evaluation of exemption).


The Trust's argument that the State has manipulated EB-5 litigation to thwart its public records requests has no evidentiary basis in the record.  The court notes that the *Sutton* litigation is not the only case the State has pointed to in relying on the litigation exception to withhold documents related to the State's role in the EB-5 process.  First, it was litigation by the State against principals in Jay Peak, which has since resolved in state court.  *State v. Quiros*, No. 217-4-16 Wncv (Vt. Super. Ct.).


The argument that the EB-5 litigation and, at this point, the *Sutton* case itself have taken too long to be considered a "temporary" pause prior to compliance with the records request makes an important policy point.  Exemption 14 says very little, and the Vermont Supreme Court has interpreted it to be broadly protective of the State's litigation interests.  In *Shlansky*, the Court noted that "the sheer frequency of traffic-stop litigation calls into question the temporary nature of that restriction, particularly when coupled with an overbroad definition of the term 'relevance.'"  *Shlansky*, 2010 VT 90, ¶ 14.  The delay in this case may have been long, but there has been no prospect of constant future such litigation that would convert a temporary exemption into a permanent one a la *Jarndyce and Jarndyce*.  Major EB-5 fraud scandals are far less common than traffic ticket cases.  The obvious overbreadth of

"relevance" at work in *Shlansky* also is not present here. There is simply no principled way in the circumstances of this case to conclude that "temporary" has graduated to "impermissibly long."

Finally, the Trust argues that all or some of the withheld documents are not relevant to the *Sutton* litigation. This argument directly contradicts the Trust's insistence that it needs the very same documents to establish the State's wrongdoing. However, it also argues that at least some withheld documents appear (based on the index of withheld documents) to have no real connection to the State's actual litigation interests in the *Sutton* litigation. It is unnecessary to determine if that might be so because the State is now willing to produce all non-privileged documents.

At some point after the Trust filed this case, the *Sutton* plaintiffs formally requested all the same documents at issue here (as well as many more) in discovery in the *Sutton* case. By the time the State filed its motion for summary judgment in this case, it was aware of the *Sutton* discovery request but apparently had not yet determined how to respond. The State subsequently determined to voluntarily comply with the discovery request (minus any privileged documents). Supplemental Declaration of William E. Griffin at ¶ 15 (filed May 25, 2021). It forecast that this production would be complete by June 11, 2021, about a month ago.

Due to the production in the *Sutton* case, the State proposed here that, following that production, it would seek some declaration from the *Sutton* judge to the effect that the materials produced in discovery in fact were "discoverable." If the *Sutton* judge so rules, it proposes, then it will produce those materials to the Trust in response to the public records request at issue here. The State reads Exemption 14 to require this unwieldy procedure. This unnecessary proposed process is a misunderstanding of Exemption 14.

The court does not believe that Exemption 14 is properly read to *require* the State to withhold anything. It *permits* the State to withhold documents that are relevant to its ongoing litigation interests as described above. Any such withholding should be as narrow as reasonably possible and must end when the litigation ends or when the requested materials are "ruled discoverable by the court before which the litigation is pending." This latter "ruled discoverable" provision ensures that discovery disputes in the underlying litigation stay there and do not migrate to the public records court. But where the State has determined to voluntarily produce documents in the underlying litigation, it then must produce them in the public records case. It no longer has any litigation interest in withholding them. In fact, that interest ends when the State determines that the documents are not privileged and thus should be produced on a contemporaneous basis with the records it provides in discovery. There is no point in trying to seek any discovery ruling from the litigation judge authorizing production after the fact—there is no such procedure in the rules for a judge to rule uncontested documents to "be discoverable." There is no controversy as to compelling production after production has occurred.

The "ruled discoverable" language in Exemption 14 accounts for discovery disputes in the underlying litigation, and it makes clear that once something is produced in discovery, it is fair game under Exemption 14. It does not make the underlying trial judge the arbiter of the public records case anymore than it allows the public records judge to issue discovery rulings in the underlying case. And it does not mean that only documents that the litigation judge compels the State to produce may be produced in response to a public records request. The Public Records Act is applied to maximize transparency consistent with its language.

Accordingly, because the State has produced the non-privileged documents responsive to the Trust's request in the *Sutton* case to the *Sutton* plaintiffs, it now must promptly produce those documents to the Trust.

Order

The parties' motions for summary judgment are granted in part and denied in part as set forth above.

Robert R. Bent,
Judge